CHARLES B. ADKINS, Respondent, v. CATHERINE E. ADKINS, Appellant.

Kansas City Court of Appeals, November 4, 1895.

1. **Divorce**: INFERENCE FROM NOT TESTIFYING. The fact that defendant did not take the stand to explain certain letters alleged to have been written during mental derangement, is regarded as a circumstance not without criminating significance.

2. ———: INDIGNITIES: CONDONATION. After certain alleged indignities offered defendant by plaintiff, they lived together as before; and it thereby seems the offenses were condoned.

3. ———: DIFFICULT CASE: DEFERENCE TO TRIAL COURT. As this case is a difficult case, and it is doubtful as to whether either party is entitled to relief, the appellate court, with some reluctance, defers to the finding of the trial court.

*Appeal from the Boone Circuit Court.*—HON. JOHN A. HOCKADAY, Judge.

AFFIRMED.

*N. T. Gentry* and *O. Guitar* for appellant.

Plaintiff is not the injured and innocent party; he has been guilty of mistreating his wife to such an extent as to cause her to leave him.    He was, therefore, not entitled to a divorce.    *Hoffman v. Hoffman*, 43 Mo. 547; *Owen v. Owen*, 48 Mo. App. 211; *McKeehan v. McKeehan*, 84 Mo. 403; *Dwyer v. Dwyer*, 16 Mo. App. 422; *Gillinwaters v. Gillinwaters*, 28 Mo. 61; *Lyster v. Lyster*, 111 Mass. 327; *Cornish v. Cornish*, 23 N. J. Eq. 208; *Neff v. Neff*, 20 Mo. App. 182; *Doyle v. Doyle*, 26 Mo. 545; *Harper v. Harper*, 29 Mo. 301; *Gilmer v. Gilmer*, 37 Mo. App. 672; *Davis v. Davis*, 60 Mo. App. 645.    "It must appear that the complainant is the innocent and injured party.    The court which stops short of this in granting a divorce fails in its duty to the state and to society."    *Webb v. Webb*, 44 Mo. App. 230.    "Where the husband's conduct has been such as to result in driving his wife out of the house, he himself is guilty of desertion."    *Meldowney v. Meldowney*, 27 N. J. Eq. 328; *Simpson v. Simpson* 31 Mo. 24.    Even admitting that the defendant was in her right mind and committed a grievous offense when she wrote the Dr. Hulen letters, her offense was fully condoned by her husband long prior to the institution of this suit. *Guthrie v. Guthrie*, 26 Mo. App. 573; *Twyman v. Twyman*, 27 Mo. 383.

*J. D. W. Robinson* with *Wellington Gordon* and *James C. Gillespy* for respondent.

(1) The lower court in the trial of this cause did look into the conduct of both husband and wife, and

after a fair and impartial trial found that respondent was the injured and innocent party and granted him a divorce and the care and custody of his two infant children, and there is sufficient and ample evidence to support the finding and judgment of the court. Where the trial court is intrusted with both facts and law the appellate court must assume the facts to be as the trial court found them, and has only the power to review the law applicable to facts in the case. *Swayze v. Bride,* 34 Mo. App. 414; *Taylor v. Penquite,* 35 Mo. App. 403–452; *Gaines v. Fender,* 82 Mo. 509; *Hamilton v. Boggs,* 63 Mo. 252. (2) It is true, as contended by appellant's counsel, that if both parties have a right to divorce, neither party has. The court must discriminate between them and say which is the innocent and injured party which the lower court did in this case. There was no evidence on the part of appellant proving the allegations in the cross-bill, and even the appellant herself did not have the brazen effrontery to come into court and support the allegations made in her cross bill against her faithful and confiding husband. *Hoffman v. Hoffman,* 43 Mo. 547; *Owen v. Owen,* 48 Mo. App. 208.

SMITH, P. J.—This is an action for divorce. The petition charges that the defendant offered plaintiff such indignities as to render his condition intolerable. A number of these are specified, but the only one in any way supported by the proof is that charging that the defendant clandestinely and without the knowledge of plaintiff wrote a number of letters to Dr. F. P. Hulen, which were of a lewd, lascivious and scandalous character, wherein defendant disclosed to him her involuntary, secret love for him, appointing places of clandestine meeting, both by night and day, and requesting him to keep her involuntary and illicit love for him a

secret from plaintiff, and therein solicited Dr. Hulen to make unlawful advances of love to her and have carnal connection with her person, etc.

The defendant filed an answer and cross bill, in which it was admitted that she wrote the letters to Dr. Hulen, which were referred to in plaintiff's petition, but alleged that at the time the same were so written she was suffering from womb disease and was of unsound mind.   The answer and cross bill further charged that the plaintiff had offered her a number of indignities, particularly specifying each.   There was a trial which resulted in a decree dismissing the defendant's cross bill and granting plaintiff a divorce.

In the record before us are transcribed the amatory letters written by defendant to Dr. Hulen.   They are undoubtedly of the lewd and lascivious character charged in the petition.   The only excuse pleaded by defendant for writing the same was that she was, at the time, suffering from "womb disease," and of unsound mind.   The testimony of the physicians who treated her ailment is not harmonious in respect to her mental condition.   Drs. Hulen and Douglass, who had charge of her case during the time the letters were written, expressed the opinion that her mind was sound; while Dr. Watson, who subsequently treated her, was of the opinion that it was unsound.   Dr. Lenoir, who heard the testimony of the three physicians just named, was called as an expert and testified that physical conditions like those described in the testimony of the physicians, which he had just heard, often produced mental derangement.

No chaste and pure-minded woman could write such unwifely, scandalous and immoral letters as these written by defendant to Dr. Hulen are shown to be.   It does not appear that Dr. Hulen countenanced, or invited, by word or deed, the writing of these letters.

The testimony of all the witnesses, with one accord, is to the effect that defendant's reputation among her acquaintances, for virtue and chastity, was unexceptionable. It is strange that the defendant did not take the witness stand herself and offer some explanation or excuse, if any she had, for the writing of these letters, instead of standing mute. It was not pretended that she was still suffering from any physical or mental derangement at the time of the trial. This circumstance is not without criminating significance. The only possible explanation of her seemingly very reprehensible conduct was her then mental aberration, and we are induced to think the preponderance of the evidence is against that.

On August 24, 1894, defendant, during the absence of plaintiff, left her home and returned to that of her parents, where plaintiff a few days later, in company with two neighbor women, made a call on the defendant and endeavored to induce her to return to his home; but this she declined to do, at the same time reminding him that on the morning that she had left home he had threatened to cut her throat. To this he replied that he was only funning and in the same connection repeated to her the lines from the latin poet, Martial:

"When Arria to her husband gave the knife,
Which made the wound whereby she lost her life,
'This wound, dear Paetus, grieves me not,' quoth she,
'But that which thou must give thyself grieves me.' "

It further appears that after the plaintiff had been apprised of the Hulen letters, he again called to see defendant, at Mrs. Newman's, where she was staying with her parents, but, instead of accomplishing his purpose, he was compelled to beat a hasty retreat before a fire poker in the hands of his irate stepmother. There was, after this, no further effort to effect a reconciliation.

It appears from the testimony of the defendant's

witnesses that the plaintiff, within the next two years before the defendant left plaintiff, did, on one occasion, without the slightest provocation, slap her in the face, and on another he told her if she went down to Goodwin's—a neighbor's—that he would take his shot gun and follow her and make her run back faster than she went. On still another occasion, while she was sick and crying because he had drank up all her wine, he caught hold of her and violently shook her, at the same time calling her "a damned fool." These and other indignities were offered defendant by the plain-, tiff, but as they afterward lived together, it seems that these offenses were condoned.

The case is not free of difficulties. It may be well doubted whether either party is entirely innocent, or entitled to any relief. The very learned and upright circuit judge who tried this case was presumably well acquainted with the parties to the suit, as well as the witnesses. He looked the witnesses in the face while testifying before him and observed their demeanor, and had a far better opportunity than we to determine just what credence and probative force should be given their testimony. In view of this, though with some reluctance, we shall defer to his finding and accordingly affirm the decree. All concur.